<u>Declaration of Mailing</u>

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JAN 13 2025

JEFFREY P. COLWELL
CLERK

I, Robert L. Floyd, Declare under penalty of perjury that the following is true and correct;

① On this date: JAN 6TH, 2025, I place in the prison Legal mail the following documents with the appropriate amount of postage in accordance with Adx procedures addressed to: Clerks Office, US District Court, 901-19TH Street, Room A105, Denver Colorado 80294-3589

• Plaintiff's Prisoner Complaint
• This Declaration.

Under PRICE V. Philpot (10TH CIR.) These documents are deemed Filed as of the above cited date.

② Please be advised $400.00 via Postal Money Order- To cover all require Fees (Filing + Admin.) should arrive, or has arrived- To the court soon. Please notify me as to any additional Fees Required that Im not aware of.

DATE: 1/6/2025

S/Robert L. Floyd

USP Admax
PO Box 8500
Florence, CO
81226

Executed on This date:
JAN/6TH/2025

8/26/24

Enclosed, is information relevant to the events that took place last year of date, 3/12/23

My name is Robert L. Floyd, and I was the victim of a brutal assault, at the hands of B.O.P. staff, while fully detained. I was what some would call being "Rodney Kinged", by over 30 C.O.S., while in handcuffs. I was blinded during this time, from being shot over 100 times by pepper balls. Basically, C.O.S. Tech, beat and stomped on me endlessly until my foot and shoulder were broken, then were ordered by the Associate Warden, to *leave the hot burning gas on my body* for over an hour.... disfiguring me. If you are unaware of the detrimental effects of the chemical known as tear gas, here are some interesting facts as to the effects of this poisonous chemical, and its harm to the human/my body. I have been suffering in constant pain since then.

*Immediately after exposure to tear gas, you can experience the following eye symptoms: 1. tearing 2. involuntary closing of eyelids 3. itching 4. burning 5. temporary blindness 6. blurry vision 7. chemical burns.* **Long-term exposure or exposure at a close range** *can lead to: 1. blindness 2. hemorrhages 3. nerve damage 4. cataracts 5.* **corneal erosion***.*

*Breathing in tear gas can cause irritation of your nose, throat, and lungs. People with* **preexisting respiratory conditions have a higher risk** *of developing severe symptoms such as respiratory failure. Respiratory and gastrointestinal symptoms include: 1. choking 2. burning and itching of your nose and throat 3. trouble breathing*

*When tear gas comes into contact with exposed skin, it can lead to irritation and pain. The irritation can last for days in severe cases. Other symptoms include: 1. itching 2. redness 3. blisters 4. allergic dermatitis 5. chemical burns.*

*According to* **Physicians for Human Rights***, prolonged or repeated exposure to tear gas can cause symptoms of post-traumatic stress disorder (PTSD). Tear gas exposure can lead to increased heart rate or blood pressure. In people with preexisting heart conditions, this can lead to cardiac arrest or death.*

**Medically reviewed by Kevin Martinez, M.D. — Written by Daniel Yetman on May 28, 2020.**

All Tort Claims were filed, Administrative Remedies exhausted as required by B.O.P. Guidelines. I am now bringing 6 claims against the B.O.P. before the courts, seeking legal remedies and punitive damages for physical assault, and the negligence to care for injuries sustained after by said staff afforded, according the law, the *8th Amendments (Gregg v. Georgia 1976), 42 U.S. Code § 1983*, which speaks to civil action for deprivation of rights, and *42 U.S. Code § 1986*, Action for Neglect to prevent. These actions/neglect have caused lasting physical and emotional damages to my being.

D. Statement of Claims

Claim One: Battery
Claim Two: Outrage
Claim Three: Excessive Force
Claim Four: Deliberate Indifference
Claim Four: Failure to Refer
Claim Six: Failure to Render Aid

1. On all relevant occasions in this complaint, I was a federal prisoner under the care and custody of the B.O.P.

2. On all relevant occasions, the B.O.P. employees were on duty and acting within the scope of their employment.

3. On 3-12-23, I was involved in an altercation with another inmate.

4. Said incident or altercation, did not involve any kicks nor ground struggling. At no time was there any kicking or stomping. The incident largely occurred and consisted of my wrists being held.

5. Over my 37 years in prison years in prison, I've never attacked staff physically. I've only on a single occasion several years ago, been found guilty of throwing substances at a staff member. I have accepted responsibility for that, and have since, never done anything like that again.

6. Officers and Staff swarmed the Unit and shouted commands to "get on the ground" and "drop the knife".

7. I was unable to comply completely because my wrists were being held, the other inmate would not let me go, and the knife was tied to my finger for protection.

8. The Officers then shot me over 100 times, mostly on my left side (as in the outer left side), with pepper balls and rubber bullets.

9. Almost everything occurring after this point or over the next hour plus, happened while I was completely blinded and experiencing moderate to severe breathing issues, such as shortness of breath, coughing and wheezing, as a result of the pepper balls and lack of decontamination.

10. The rubber bullets and pepper balls caused wounds, lacerations, and sores to my body, some of which seeped blood, while others resulted in pain and suffering as a direct result of the lack of decontamination. Infra pp. #25.

11. Not only did I offer no resistance as Officers "pushed me" using body sized plexiglass shields that took me to the ground, but Staff made no official or unofficial allegation, that I ever resisted them.

12. I was fully immobilized and released the knife, which Officer Roberts had kicked away. The shields secured me to the ground, immobilizing me. I was then turned onto my stomach, still prone and handcuffed, still secured by shields and Staff.

13. Throughout this process, I heard at least three distinct voices cursing at me saying, "You f*cking mother f*cker", "Piece of sh*t", "N*gger", and "We're getting sick of your sh*t, problem child".

14. This is when I felt someone stomp on my right foot with such great force, that it immediately broke. I knew this because I heard the snap of bones emanate from inside my body. I did not immediately feel the pain because of the adrenaline inducing circumstances, despite feeling the break.

15. The entire time, I was clearly, fully immobilized, mechanically restrained, prone on the ground, and absolutely not resisting.

16. Shortly thereafter, Staff so vehemently, violently, and unnecessarily jerked me up, that they in a single instance, hyperextended my left shoulder, which emitted an audible crack or pop.

17. Staff, then slammed me into a wall, as if I'd been shot out of a cannon. The massive amounts of force and pressure they are applying are turning my right foot and left shoulder to a wrecked wasteland of further injury.

18. At no time did I ever resist. At all times I am blind, restrained by Staff, mechanically restrained and struggling to breathe, I am wheezing and coughing.

19. I am then forced to limp to the decontamination/interview/holding cage, a cage just large enough to stand in and take a small step in any direction.

20. Officer Roberts and/or another Officer, then tries to decontaminate me saying, "We need to wash his eyes first".

21. I then hear an angry voice say, "Leave the gas on him!" I then asked, "who is that speaking?"

22. A.W. (Assistant Warden) Jackson then says, "Me! A.W. Jackson, leave that sh*t on him! You want to inconvenience us; we're going to inconvenience you."

23. For the first time, I tell him and all present, that my foot is broken, that I can't walk or stand, and that I need medical care for my foot and shoulder, that has been seriously injured. I was hoping that by that time, a camera was present to record my statements, and that treatment be provided thereby. They knew I was in agony, yet did not care.

24. No one present offers decontamination, medical care access, nor even a chair to sit in to prevent further foot injury.

25. Over the next hour, I'm left there blind, burning, and suffering the most unbearable and outrageous pain imaginable, being forced to stand on my broken foot. I could not even sit, because when I tried to position to a sitting position, still handcuffed at hands and legs, the pressure and positioning of my foot, caused even more agony, and I knew that my body would

2.

not allow me to sit without threatening further injury. My pain was a 10 out of 10. Also, the pepper ball powder co-mingling with and being absorbed into my open wounds and lacerations received as a result of the rubber bullets and pepper balls. Some of the seeping blood mixed with the powder, and it all spread to other broken skin wounds. Having the pepper powder infiltrate open wounds was its own hell and made me feel like I was on fire. This how they left me for more than an hour or so.

26. As to my shoulder, not unlike my foot made worse by the restraints, every small movement or slight twinge, brought excruciating pain, pain that makes you want to scream. The restraints locked my shoulder into its dislocation, which worsened every aspect of the pain and injury. See Exhibit #5, #6, and #7 (*records of torn tendons*).

27. All of these injuries, traumas, and pains were driving me to anger, rage, insanity, and nothing short of madness. See Exhibit #5 (*Pain Diary*)

28. Lt. Rawlings, who had been present earlier, returned one hour or so later with a camera, and I was then decontaminated. I was then escorted to medical, unable to walk, and it was obvious to all Staff, no wheelchair was provided.

29. I stated on camera all that occurred, that Staff broke my leg, very severely injured my shoulder, refused to contaminate me and left me blind and in agony, for over an hour, on a broken foot.

Claim Seven: Medical Negligence.
Claim Eight: Deliberate Indifference, Jones.
Claim Nine: Failure to Refer.
Claim Ten: Deliberate Indifference, Hopper.

30. Nurse Jones was waiting in medical and witnesses me limping in the room.

31. I told him all of my injuries and how I got them. I tell him I can't walk, my foot is broken, my shoulder is in serious agony and hyperextended. I show him my foot that is so swollen, it is twice the normal size.

32. Despite the above, Jones says he "*does not think the foot is broken*", before/without any examination.

33. I was not given an x-ray, nor provided any treatment, nor even provided a wheelchair so that I wouldn't have to limp back to the Unit, which was a several minute walk away in my condition.

34. I was forced to limp back to my cell and spend the night in extreme, unsufferable, and unimaginably severe foot and shoulder pain. It was so bad, I wanted to just die so it would end. I could do nothing without agony, such as sitting on a toilet, washing my face, wiping my rear, sleeping, getting up, and everything in between.

35. The next morning, Ms. Hopper was delivering A.M. medications, she works for Health Services. This occurred on 3/13/23.

36. I told her that I "needed treatment for my broken foot and hyperextended shoulder". I also requested "x-rays and a Toradol shot, for pain."

37. Ms. Hopper refused to provide any services or to alert any medical provider of my injuries.

38. On 3/13/23, I was moved to C-Unit.

39. On 3/14/23, I again alerted medical staff on A.M. medication "Pill Line" of my complains and needs, exactly as I did with Ms. Hopper one day prior. I also gave them a written request, called a "Sick-Call Request."

40. Later that morning, I was taken for an in-house ADX x-ray for my foot and shoulder in a wheelchair.

41. Immediately after the x-rays, P.A. (Physicin Assistant) Mrs. Maltezo said, "Your foot is broken at the 2nd and 3rd metatarsal bones."

42. She then gave me a shot for pain.

43. After I was wheeled back to my cell, Nurse Huddleston applied a "Snow Boot" to my foot. A type of brace, but not a cast.

44. The 3/14/23 x-ray of my foot shows two "[A]cute transverse Nondisplaced Fractures" at the "third.... [and] second metatarsal" bones. Exhibit #1 (copy of x-ray)

45. On 3/30/23, medical provider P.A. Maltezo issued an M.D.S. form for a "Front Cuff Pass", which requires guards to cuff me in the front to protect and prevent further injury to my shoulder. Exhibit #2 (M.D.S. form)

46. On 3/30/23, I noticed that my left clavicle was raised much higher than the right. I don't know how long it had been like this. I am waiting a further series of assessments on my shoulder to determine the nature of my injury and its extent. Exhibit #5 (torn tendon).

47. My pains, traumas, and sufferings encompass more than outlined in this complaint, and will be detailed as injury sustained, as injury and damages become relevant. These facts reflect the consequences of these injuries from the date I was assaulted to the present. See Exhibit #5 (Pain Diary).

48. For several weeks after the initial assault on 3/13/23, medical staff persisted in providing wholly ineffective pain medications to treat my pains and agonies, despite me informing them verbally at Pill Line and in several "Sick-Call Requests." Exhibit #3 (copy of requests).

4.

## D. STATEMENT OF CLAIMS

## LEGAL ARGUMENTS

CLAIM ONE: **Battery Against the United States**

52. Battery Occurs when the tort feasor *"acts intending to cause harmful or offensive contact with the person of the other.... and an offensive contact... directly or indirectly results."* White v. Muniz, 999 P.2d 814, 816 (Colo, 2000) (adopting Restatement (second) of Torts § 18 definition).

53. "[W]illful and Malicious Injury" has the same elements as the *"intentional torts of assault."* Polanco v. Roth, 2019 Bankr. LEXIS 703, at pp. (Bankr. D.Colo. Feb. 21, 2014) (citing White, supra).

54. *"The requirement of maliciousness is satisfied upon a showing that the injury was committed without just cause or excuse."* Id. at pp. #14. Malicious means, *"...wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill will and malice may be implied by the acts and conduct of the [person] in the context of the surrounding circumstances"* Id. At pp. #21 (quoting Ball v. A.O. Smith Corp., 451, F3d 66, 69 (2nd Cir. 2006)).

55. This Court should hold that battery's intent element is met if a plaintiff shows that the conduct at issue meets the Eighth Amendment's *"malice"* standard, which is equal, if not higher a bar to prove.

56. Under the Eighth Amendment, threats can help determine *"the Officer's subjective state."* Bozeman v. Orum, 422 F3d 1265, 1271 n. 11 (11th Cir. 2005); Mann v. Folley, 578 F. App. x 267, 272 (4th Cir. 2014) (same); see also Pega v. Greffet, 108 F.Supp. 3d 1030 n.8 (D.N.M. 2015) (*"statements .....made...contemporaneous with the use of force, e.g., racial slurs or personal animus."*).

57. Also, where "there is no legitimate penological interest...the conduct itself is sufficient evidence [of] malice. "Giron v. Corr. Corp. of Amer., 191 F.3d 1281, 1290 (10th Cir. 1999); Accard Mata v. Saiz, 427 F.3d 745, 758 (10th Cir. 2005).

58. Other factors help determine malice, such as:

a. *"the need for ...force"*
b. *"the relationship between that need and the amount used."*
c. *"the threat reasonably perceived... and"*
d. *"any efforts made to temper to severity of a forceful response"*
e. *"the degree of injury."* Hudson v. Mc Millam, 503 US at 7.

59. Instantly, Defendant's conduct was malicious under battery and Constitutional standards because: (a.) Staff cursed at me before breaking my foot, supra pp. #13-14; (b.) Staff's post-assault desire for vengeance by refusing to provide medical care/decontamination, supra pp. #22-24; there was no need for force because at all times I was fully secured and not resisting (supra pp. #11, 12, 15, 18); the force used was disproportional to the need because I was secured and complaint, supra, and a guard stomped my foot one time so hard, that he broke two bones (supra pp. #14); there was no "threat reasonably perceived" for the reasons stated above; there were no efforts "made to temper" the response's severity because both the stomping of the foot and the jerking of the arm, happened in one single instance, (supra pp. #14, #16). Staff also continued to exacerbate the injuries, (supra pp. #17, 23-25, 28). The "degree of an injury", is a badly broken foot, supra pp. #44, and a severely injured shoulder. See supra pp. #16-17 (initial injury), #25-26 (pain handicaps), #45 (recognition by medical of handicap), #46 (notices raised clavicle); and as to the lack of "penological interest" determination, that is addressed below.

60. Defendant's conduct was malicious because they had no penological interest in violating several policies; theirs is no just cause or excuse, Polanco, 2019 Bankr. LEXUS 703 at pp. #14; accord Giron, 191 F.3d at 1290, in violating B.O.P. policies. The Defendant violated:

(a) 28 CFR: 552.22 as they used force. "to punish", supra pp. #13-18.
(b) 28 CFR: 552.22 (c) as they used more force than necessary to gain control of" me, supra pp. #12-18 (fully secured at all times).
(c) P.S. 5566.06 as they used "physical violence [and] intimidation", supra pp. #13-#17.
(d) P.S. 3420.11 as they used "Profound... abusive language", supra pp. #-13.

61. Lastly, even conduct as simple as forcing handcuffed prisoners to the floor and kneeing them in the back states a claim of battery, McCullom v. United States, 2014 U.S. Dist. LEXIS 25173 (D. Colo. Feb. 26, 2014); thusly, the U.S. is guilty of battery for breaking my foot and injuring my shoulder.

CLAIM TWO: **Outrage Against United States**

62. "Outrage" occurs when "(1.) the defendant engaged in extreme and outrageous conduct, (2) recklessly or with the intent to cause the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress" Pearson v. Kancilla, 70 P.3d., 594, 597 (Colo. App. 2003).

63. "Conduct otherwise permissible may become extreme and outrageous if it an abuse by the actor of a position in which he has actual... authority over the other, or the power to affect the others interests." Zalnis v. Thoroughbred Datsun Car Co., 645 P2d 292, 294 (Colo. App. 1982). Conduct may become outrageous where the Defendant proceeds though he knows that the Plaintiff "is particularly susceptible to emotional distress caused by reason of some physical or mental condition or peculiarity." Restatement (second) of Torts: 46; see also English v. Griffith, 99 P3d 90, 93 (Colo. App. 2004) "While it is true that courts are more likely to find outrageous conduct in a series of incidents or in a "course of conduct" than in a single incident it is the

6 '

totality of said conduct, that must b evaluated to determine whether outrageous conduct occurred." Zalnis, 645 P.2d. at 294, Estate of Trentadue v. United States, 397 F.3d. 840, 856 (10th - Cir. 2005). The Tenth Circuit stated that violating a person's Eighth Amendment Rights is necessarily and "outrageous and intolerable" conduct.

64. I declare that to commit a felony is also "outrageous", specifically, the crime of where a crime is imputed in a civil action, its existence may be proved by such evidence as would suffice to prove any other fact involved... a preponderance of the evidence", Brown v. Tourtelotte, 50 Pac, 195, quoted in Stone v. Union Fire Ins, Co., 107 P.2d. 241, 245 (Colo. 1940).

65. Defendant committed outrage by: cursing me, supra pp. #13; while breaking my foot in spite of me being fully secured and at no time resisting, supra pp. #14, 15; causing me to suffer a very serious handicap inducing lifestyle changing shoulder injury, that as of this writing, isn't yet diagnosed, while I was fully restrained and not resisting, supra pp. #16, 18; using further unnecessary force that resulted in further injury, supra pp. #17; refusing to decontaminate me or provide medical care as a punitive measure, supra pp. #20-24; forcing me to walk on a foot I had stated several times, was broken while I was limping and clearly handicapped, supra pp. #28, 29; and also by following the wrongs.

66. The Defendant committed outrage, by violating the "Use of Force" policies cited above, supra pp. #60, as well as the policies surrounding decontamination, such as is found in the Correctional Services Manual, P.S. 5500.11 or the Correctional Services Procedures Manual, P.S. 5500.12, and to which I have no access.

67. Defendant committed "outrage" by violating my Eighth Amendment Rights to be free from excessive Force and Deliberate Indifference, see infra claims Three and Four; cf. Benefield, supra (such violations "outrageous"), and also committing Battery, supra (Claim One), and Failure to Refer, infra (Claim Five). See Kirk v. Smith, 674 F.Supp. 803 (D. Colo. 1987) (stating a termination must be combined with other wrongful behavior such as physical assault, ridicule, humiliation to constitute an arguable claim of outrage); see also Kikumura v. Osagie, 461 F.3d. 1269, 1301 (10th Cir. 2006) (outrage claims viable alongside "failure" to refer claims for ADX prisoners.

68. Because I am in the United States' custody, and because Defendant abused his authority, "outrage is evident". Compare Zalnis, supra ("abuse of power may be outrageous), with supra pp. #14 (punitive battery on leg), #16 (shoulder), #17 (force), #20-24 (no decontamination, medical care), #25 (passive pain infliction, and #28 (forced to walk on broken foot).

69. Because Defendant knew I was "particularly susceptible to emotional distress, by reason of some physical condition...", i.e., my foot, shoulder, contamination, "outrage" is evident. Compare English, supra (knowledge shows intent), with supra pp. #20-25 (refusal of care), #28 (same).

70. Because Defendant's acts occurred in a "series of incidents", outrage is evident. Compare Zalnis, supra with supra pp. #13, 14, 16, 17, 21-24, 28.

7.

71. The factors of "intensity and duration of the distress", Estate of Trentadue, supra, are found by being afflicted by intense pain, consequent mental and emotional trauma and sufferings, as well as the mental and emotional sufferings resultant from my leg and shoulder handicaps. See supra pp. #25, #27, #34, #47-48.

72. The first element of "extreme and outrageous conduct", is met by the claims above, supra pp. #64-70. The second element of intent is met by the claims above, supra pp. #64 (felony commission), #65 (obvious indications of malice), #66 (policy violations evincing lack of penological interest, i.e., malice), #67 violating the Eighth Amendment Rights, other torts), #68 (abuse of power), #69 (knowledge of my vulnerability), #70 (series of wrongful acts). The third element of "causing …distress" is met by all of the above in addition to the facts above, supra pp. #34, 47-48 (referring to "Pain Diary" detailing all traumas and handicaps).

73. The Court shall consider Kikumura, 461 F.3d. at 1301, and Enright v. Groves, 560 P.2d 851 (Colo. App. 1977) (outrage found where officer illegally arrested a woman, twisting her arm despite being told her arm dislocates easily.

---

CLAIM THREE: Excessive Force Against John Doe[s]

74. In an excessive force case, "the core judicial inquiry is… whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm", Hudson 503 at 6 – 7. Force is "wanton" if there is no need for it, U.S. v. Walsh, 194 F.3d. 37, 50 (2nd CIR. 1997); thus, evidence an officer kicked a handcuffed person who was on the ground shows malice, Lweis v. Downs, 774 F.2d. 711, 714 (6th Cir, 1985). I incorporate my malice caselaw that was cited priorly, here, see supra pp. #56 -58.

75. As to any requirement, there is no "de minimus injury requirement" to an excessive force case, even one involving handcuffing. U.S. v. Rodella, 804 F3d. 1317, 1327-28 (10th Cir. 2015) collecting cases) (treating Wilkins v. Gaddy, 559 U.S. 34 (2010) and holding that while the "extent of the injury may… provide some indication of the amount of force applied", "injury and force … are only imperfectly correlated, and it is the latter that ultimately counts."). See also Northington v. Jackson, 973 F.2d. 1518 (10th Cir. 1992).

76. I incorporate my arguments on malice stated priorly to show malice existed in this Constitutional context. See supra pp. #59-60 (Battery Facts).

77. By any standard, a broken foot and seriously injured shoulder, both of which have handicapped me up to the Eighth Amendment's "objective component". However, because malice exists, supra pp. #76, injury's extent is irrelevant.

78. Restrained prisoners who are assaulted invariably have viable claims under the Eighth Amendment. See Miller v. Glanz, 948 F.2d. 1562 (10th Cir. 1991) (restrained, beat, kicked, choked); Walton v. Gomez, 745 F3d. 405, 429 (10th Cir. 2014) (handcuffed while much of the

8.

disproportionate force occurred..." denying summary judgment); Mitchell v. Maynard, 80 F3d. 1440, 1441 (10th Cir. 1996) (restrained, beaten, using racial slurs); (Bogan v. Stroud, 958 F2d. 180, 185 (7th Cir. 1992) (violation found if force is used on restrained prisoner even if guard is previously stabbed.

79. For all of the reasons, the John Doe(s) who broke my foot and seriously injured my shoulder violated my Eighth Amendment Rights in their/his official capacity. Supra pp. #14, 16, 17, 25-27, 34, 45-47.

---

CLAIM FOUR: Deliberate Indifference of A.W. Jackson

80. The 8th Amendment forbids the "infliction of wanton and unnecessary pain". *Estelle v. Gamble, 429 US 97, 104 (1976).* "Deliberate and indifference to serious medical needs of prisoners constitutes an unnecessary and wanton infliction of pain". *Mitchell v. Maynard, 80 F3d. 1433, 1444 (10th Cir. 1996.)* Guards are deliberately indifferent when they delay access to medical care, Estelle, 429 US at 104-105. A "prisoner who suffers pain needlessly when relief is available has a cause of action against those whose deliberate indifference caused his suffering." Bore Hi v. Wiscomb, 930 F.2d.1150, 1154, (6th Cir. 1991), cited approvingly in *Mata v. Saiz, 427 F.3d. 745, 755 (10th Cir. 2005)* (Nurse's failure to as a "gatekeeper" to refer a patient to a doctor is deliberate indifference). Not decontaminating prisoners after using chemical weapons can constitute deliberate indifference, *Clement v. Gomez, 298 F.3d. 898, (9TH Cir. 2002); Danley v. Allen, 540 F.3d. 1298. (11th Cir, 2008); Williams v. Benjamin, 77 F.3d. 756 (4th Cir. 1996)* (same). A restraint claim is only viable if they "exposed [the plaintiff] to a great pain or that any of his discomfort [was] occasioned, either deliberately as punishment or mindlessly with indifference to his humanity." *Fulford v. King, 692 F.2d. 11, 15, (5th Cir. 1982);* accord. *Smith v. Coughlin, 748 F.2d. 783,787 (2nd Cir. 1984)* treating *Rhodes v. Chapman, 452 US 337, 346 (1981).* A broken leg is a serious medical condition, *McBride v. Deer, 240 F.3d. 1287, 1290 (10th Cir. 2001)* ("lifelong handicap or permanent loss"). It is obvious to laypersons that the failure to splint or immobilize a fractured limb, especially before movement, puts the person at risk for future injury and increased pain, *Croft v. Hampton, 286 F. App x 955 (8th Cir. 2007).*

81. Here, Jackson sought to punish me where no penological interest existed in refusing to ensure a timely medical assessment of my broken foot and shoulder injury, which is, I informed him of. See supra, pp. #23-24. Moreover, even though I was blind, supra pp. #9, it can be inferred that Jackson was present for the minutes immediately preceding his refusal to decontaminate me, which is to say, he saw me limp in a holding cage, supra pp. #19. He delayed treatment by not alerting her doctor to my broken leg and broken foot and "alleged" serious shoulder injury and then he left me in restraints that further exacerbated my pain, supra pp. #26. This malicious delay in care forced me to stand on my broken foot, causing insufferable pain. supra, pp. #25, and God knows what further injury. While the delay was only one hour, it was one hour under the traumas of several serious injuries, blind and burning, and all four punitive purposes, supra pp. #25-27. This is clear deliberate indifference as actions without a legitimate

penological interest "lends support to a constitutional violation", *Escobar, supra*. He caused me to suffer immense pain from serious medical conditions needlessly, in addition to interfering and prohibiting staff from decontaminating me.

82. My injuries, traumas, and interferences thereto are now incorporated here, supra pp. #44-48. Had Jackson called a doctor, I would have received treatment without a two-day delay in care regarding my foot and a much longer delay regarding my shoulder. Had he allowed staff to decontaminate me, I would have been spared the suffering, burning, and blindness. See supra pp. #25.

83. Jackson is liable for being deliberate, indifferent, to my serious medical need for decontamination and medical care for my broken foot and serious shoulder injury.

CLAIM FIVE: Failure to Refer Against U.S.

84. The U.S. had a duty to contact the prison infirmary when allegations, evidence of serious injuries, and broken being sustained, were made known.

85. Negligence requires that there must be a duty imposed by law and breach by the defendant with resultant damages. *Roessler v. O'Brien, 119 Colo. 222*. "To prove causation, the plaintiff must show that the injury would not have occurred but for the defendant's negligent conduct." *Kaiser Health Foundation. Health Plan of Colo. v. Sharp, 741 P.2d. 714, 719 (Colo. 1987)*.

86. A duty exists from guards to prisoners to protect them from injury, Kikimora v. Osagie, 461 F.3d. 1269, 1301, (10th Cir. 2006) (applying Laman factors on common law duty). "Colorado law would impose a duty of care on prison officials to protect inmate's health and safety", Ajaj v. US, 293 F. Appx. 575, 581 (10th Cir. 2008).

87. Moreover, in cases where a "special relationship" exists, such as when a plaintiff prisoner "is dependent on and under the control of ADX Prison and its staff", Kikumura, 461 F.3d. at 1301, liability for non-feasance and an affirmative duty to act protect direct follow. ("One who … takes…custody of another…such as to deprive…opportunities for protection are under a … duty to the other for the same").

88. The *existence and scope of duty* is a question of law, Metro. Gas Repair Serv. Inc. v. Kalik, 621 P.2d. 313 (1981). *Legal duty* is defined in terms of standard of care; the corresponding. Standard essentials to the proper discharge of the duty may originate from a judicial decision or a legislative enactment, Dare v. Sobule, 674 P.2d. 960, 963. (Colo. 1984). Administrative regulations may provide evidence of a scope of a duty owed to a plaintiff, i.e., the standard of care. Even where a "regulation does not define the applicable standard of care [negligence per se], it may nonetheless be relevant evidence bearing on the issue of negligent conduct." Id. at 931, (quoting Restatement, (Second) of Torts: 288. B); cf. Blueflame Gas, inc. v. Van Hoose, 679 P.2d. 579, 591-92. (Colo 1984) (holding that although compliance with administrative safety regulations did not establish due care, it was evidence of due care, it was evidence of due care.

10

See generally Shinder v. US 661 F.2d. 552. (6th Cir. 1981) (collecting cases) (distinguishing federal regulations that evidence duty [negligence], from those that absolutely define duty [negligence per se]. If regulations evidence of a standard of care, non-compliance may permit the trier of fact to find negligence, Magness, 946 P.2d. at 932.

89. The scope of the U.S.'s duty is evidenced by the following policies and regulations:

(a) "In immediate use of force situations, Staff shall seek the assistance of... qualified health personnel upon gaining physical control of the inmate. When possible, Staff shall seek such assistance at the onset of the violent behavior... After any use of force... the inmate shall be examined by qualified health personnel and any injuries noted, immediately treated" 28 CFR § 552.26 (a)-(b).

(b) "As soon as control of the situation has been obtained, Staff must record information on ... injuries" P.S. 5566.06 (14) (c), pp. #5 (Use of Force Policy).

90. ((a)) ((1.)) Under the Deliberate Indifference and Medical Negligence Causes of Action, infra pp. #35-40; therefore, Jackson's actions directly caused my injuries because as a matter of law, it can be assumed had he obtained care, it would have been in accordance with the U.S. Constitution and the "standard of care" sufficient to avoid liability in Colorado

(2) it is legally irrelevant what injury occurred or didn't occur or why, the factor asks about the "risk", supra, in addition, even if an injury is unlikely, if the risk includes death or lifelong handicap "the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution", Laman, 744 P.2d. at 49. (citations omitted). In conclusion, the "risk" here in denying medical care cannot be higher, or any higher, it even makes the factor of "likelihood" id at 46, easier to approve by lowering its bar. Here, the risk is death.

(b) "[T]he foreseeability and likelihood of injury"

Lastly, the B.O.P.'s promulgated regulations and policies mandating, and very tediously directing, post use of force medical assessments and treatment, §552.26 (a), (b); see generally P.S. 5566.06 (Use of Force Policy), manifests recognition of the BOP and the U.S. that Staff use of force predictably result in inmate's injury; the policy and regulation response to that concern. "[F]oreseeability is based on common sense perceptions of the risks created by the various conditions and circumstances." Laman, 744 P.2d. at 48.

(c) "[T]he social utility of the [defendant's] conduct": here, there is no social utility in committing Deliberate Indifference in violation of the Constitution, see supra pp. #89 parts (a) – (c) (Medical care for inmates), nor in my custodians withholding care to punish and avenge in full malice, supra pp. #21-24. See infra Part (d) (law costs, high risk, outweigh utility).

(d) "The magnitude of the burden of guarding against injury or harm": here, there is already regulatory, policy, and operational mechanisms in place to promptly record injuries (and almost certainly provide medical care thereafter), supra pp. #89 part (c), on the part of the guards. Also, there exists the same on the part of the medical staff regarding assessing/treating prisoners after a Use of Force, supra pp. #90 part (b). The gist of the propositions in Cohen and Antrum is that

*11*

where the cost of precautions is relatively low, the social utility in not taking them, is usually outweighed by the risk involved. Here, the costs have already been assumed; there is no burden and there is no social utility that outweighs the risks of serious injury and death. Supra.

(e) "The consequences of placing the burden upon" the defendant: here, because there is no burden, there are no consequences; also, to compel guards to provide access to medical care and avoid violating my Right to be Free from Deliberate Indifference, produces only good outcomes for all involved, not a single one being a "consequence."

**Thus, a duty exists based on the analysis of the Laman factors.**

Addendum to Part (b), supra; because "standards or procedures may provide circumstantial evidence that a prison healthcare gatekeeper knew of a substantial risk of serious, serious harm in situations for which they are given instructions, Mata, 427 F3d. at 57, the various policies and regulations on medical care, supra pp. #89, clearly render my injury of foot and shoulder foreseeable and likely. Mata treats a Deliberate Indifference case, but there is no reason why its reasoning should apply in the tort context. To "Know of a substantial risk of serious harm", id., very easily engulfs the much lower negligence standard of an injury being rendered "foreseeable" and "likely". The prison policies and regulations, in other words, inform as to a defendant's subjective state of mind (Deliberate Indifference), and as to the objective aspects of the "foreseeability and likelihood of injury", Laman, from the perspective of reasonable person, (negligent failure to refer), who is bound by them. Lastly, I told the staff my foot was broken and my shoulder was badly injured, yet no care was provided, supra pp. #23-27. This rendered my pain and injuries foreseeable and likely.

91. Having established a duty existed, now I will show the Defendant breached that duty by failing to provide medical care on several occasions, supra pp. #23, 24, 28, despite having knowledge of my injuries and limping, supra pp. #19, 23, 28.

92. Defendant's breach proximately caused my injuries, because had I received proper medical care at that time, I would not have been forced to suffer; the standing on my broken foot, supra pp. #25, the rear-cuffing that was later forbidden by medical, supra pp. #26, 45, and the forced walk to medical, supra pp. #28. The facts show that once I received medical care of minimal standards, I was given a wheelchair for transit, a snowboot, and a "front-cuff" order, supra pp. #40-45. Therefore, it is clear that medical care would have mitigated my pain, and its lack thereof proximately caused my injuries and pain.

93. My injuries and traumas are cited above, supra pp. #25-28, 34, 47.

94. The Defendant had a duty to "see that which is plainly visible", i.e., my limping, and to take heed of my allegations of a broken foot and injured shoulder, Clark v. Bunnell, 470 P.2d 42, 45 (Colo. 1970). Restatement (Second) of Torts § 314(a), "the defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is... injured. He is not required to take any action beyond that which is reasonable under the circumstances", JGE v. U.S., 2016 US Dist. LEXIS 106245, at F.N. #3 (D. NM, Aug. 9, 2013).

12

95. The Discretionary Function Exception does not apply because the Defendant violated prison policy, 28 CFR § 522.22 (h) (3), as well as my Eighth Amendment Rights, supra pp. #80-83 (claim four). See Burton v. US, 669 F.2d. 977, 979 (10th Cir. 1979) ("Fixed" or "readily ascertainable standards" prelude application of the "D.F.E."); ("Courts have read the Supreme Court's [D.F.E.] cases as denying protection to actions that are unauthorized because they are unconstitutional.

CLAIM SIX: Failure to Render Aid Against U.S.

96. The U.S. had a duty to render aid and decontaminate me.

97. I incorporate the sections on negligence law, the existence of duty and Special Relationships, as well as the law on the scope of duty, supra pp. #85-88.

98. The existence and scope of this duty arises out of policies and directives on the decontamination of prisoners, supra pp. #66 (confidential documents); supra #88 (law on scope of duty arising out of policy).

99. Moreover, a duty to decontaminate arises out of the common law by applying the Lannon Factors, as follows:

(a) "The risk involved": here, Defendant's refusal to decontaminate risks pain and suffering, supra pp. #25. It also risks more serious injuries, because it blinds prisoners which is a temporary handicap, who may fall or hurt themselves trying to perform any number of tasks, such as walking into a wall, etc.

(b) "The foreseeability and likelihood of injury"; here, it is common knowledge that in refusing to decontaminate, it is certain that hours of pain and suffering will follow, as did here, supra. Moreover, because policies and directives *require* decontamination, it can be inferred that a reasonable person would have deemed my injury foreseeable and likely. See Mata, 427 F. 3d. at 57 ("standards or procedures" evidence knowledge of a risk of harm in Eighth Amendment Deliberate Indifference case.); supra pp. #30-31 (discussing in "My Addendum to Part (b)" the applicability of the instant inference to negligence's reasonable person standard to show foreseeability and likelihood).

(c) "The social utility of the [defendant's] conduct"; here, there is no utility in being Deliberately Indifferent in violating my Eighth Amendment Rights, supra pp. #80-83; nor in violating the policies and directives on decontamination, supra pp. #66; nor in seeking to punish and avenge in full malice, supra pp. #21-22.

(d) "The magnitude of the burden of guarding against injury or harm"; here, I incorporate my prior argument, supra pp. #90 part (d) (addressing same factor for prior claim). I'll only modify the last saying that the risk here is pain and suffering, not "serious injury or death", supra. Also,

13,

I'll add that the existence of policies and directives on decontamination, supra pp. #66, mean that the "burden" and any associated "costs" have already been assumed; hence, there is no burden to speak of.

(e) "The consequences of placing the burden upon" the defendant; here, I'll incorporate my prior argument, supra pp. #90 part (e) (addressing same factor for prior claim), except I'll substitute "provide access to medical care" for the following: "decontaminate prisoners in compliance with agency policy and directives".

Thus, a duty to decontaminate exists based on the Lannon Factors.

100. The U.S. breached its duty to render aid and decontaminate when it interfered with and refused to effectuate the decontamination process on me, supra pp. #20-23.

101. The breach proximately caused my injuries because had the U.S. not interfered with the decontamination, supra #21-22, and had the U.S. followed decontamination policies and directives, supra pp. #66, I would have been decontaminated and my pain mitigated, supra pp. #18, 25 (injuries).

102. I incorporate the case law on Duty and the text of a treatise on tort law here, supra pp. #94 (duty to see what's visible, render aid).

103. I incorporate the "D.F.E." case law cited above, here, supra pp. #95 to show that because Defendant violated my Eighth Amendment Rights, supra pp. #80-83 (Deliberate Indifference claim), and because it violated policies on decontamination, supra pp. #66, and because it violated policies on treating injuries after Use of Force in a timely fashion due to malice, supra pp. #20-25, it is not entitled to the "D.F.E." protection.

---

CLAIM SEVEN: Medical Negligence of U.S.

104. The U.S. was medically negligent by not immediately ordering and x-ray and diagnosing my broken foot until two days had passed, or by not treating my broken foot, or both.

105. "A general claim for negligence in medical treatment arises when a physician's care falls below the degree of knowledge, skill, and care used by other physicians practicing the [same] specialty", Gorab v. Zook, 943 P.2d. 423, 427 (Colo. 1997). "Like other negligence actions, the plaintiff must show a legal duty of care...breach of that duty, injury...and [proximate cause]", Day v. Johnson, 255 P.3d. 1064, 1068 (Colo. 2011). A *"breach of the duty of care"* occurs when a "defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine,,," id. At 1069. Moreover, the "standard of care" and its subsequent breach must be shown by expert testimony "unless the subject matter...lies within the ambit of common knowledge or experience of ordinary person..." Melville v. Southward, 791 P.2d. 383, 387 (Colo. 1990).

106. Here, the duty owed to me arises out of the common law "contractual relationship when a physician under takes to treat or otherwise provide medical care", Day, 255 P.3d. at 1069. Any duty arising out of an "[expressed] contractual relationship" can be asserted upon the regulations and confidential directives and policies cited before, Galardo v. US, 752 F.3d 865, 870 (10th Cir., 2014); supra pp. #89 (requiring treatment in different situations, including post Use of Force and record keeping).

107. To argue that my alleged duty does not exist, that any plaintiff similarly situated isn't entitled to immediate treatment and diagnosis of a broken foot limiting all capacity to walk is a legally untenable position. For this reason, no expert testimony is required; here, I was clearly limping and unable to walk, supra pp. #30; I told Jones of my foot being broken, supra pp. #31; and my foot was twice its normal size, supra. Any normal person would suspect a broken foot or bone in these circumstances and would immediately seek to have this suspicion confirmed with an x-ray, a medical examination ordinary persons know is commonly used to diagnose broken bones and a familiar term commonly used. Ordinary persons know that broken bones in the foot need to be immediately immobilized in some form of cast or brace.

Here, to force my facts are preclusive of expert testimony. Ordinary persons would have suggested I be x-rayed and have my foot put foot in a brace such as constitutes the "standards of care ordinarily possessed and exercised by members of the same school of medicine", Day. Additionally, ordinary persons would have also suggested that I be examined and professionally assessed by a medical professional who would "use his best judgment in the application of his skill in deciding upon the nature of the injury and the best mode of treatment", Day, 255 P2d. at 1069 (implied duties of physicians). Here, defendant's duty to diagnose and treat a clearly broken foot was breached and no expert testimony is needed.

108. Here, having established the existence of a duty of care, and having shown that the standard of care needs no expert testimony to inform the court, I will show a breach of that standard. Specifically, by not ordering an immediate x-ray, supra pp. #33, Defendant failed to exercise his due care in properly diagnosing an obviously broken foot. By not conducting any *other* assessments, Defendant failed to diagnose my foot injury. Defendant's statement that he "does not *think* my foot is broken" is evidence of the misdiagnosis and consequent breach of duty. See Person v. Norman, 106 P.2d 361, 363 (Colo, 1940) (statement to patient of "no fracture" evidence of misdiagnosis); discharging patient evidence of proximate cause of resulting injury due to non-treatment. See Pearson, 106 P.2d at 363 (diagnosing fracture as a bruise....)

109. To the extent that the lack of need for expert testimony equates to a lack of need to produce a "certificate of review" to establish the applicable professional standards and minimal levels of competence", Shelton v. Penrose/ St. Francis Healthcare Sys., 984 P.2d 623, 627 (Colo. 1997). Thus, the Court should use its discretion and not require a certificate. Shelton, 984 P.2d at 627.

CLAIM EIGHT: Deliberate Indifference (Jones)

110. Mostly relevant here, I incorporate the case law sited above here, supra pp. #80. I will only add the following, a "claim is therefore only actionable in cases where the need for additional treatment is obvious. An obvious [is where] a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition", Hunt v. Uphoff, 199 F.3d 1220, 1223 (10th Cir., 1999). A broken foot is a serious medical condition, McBride, 240 F.3d at 1290-91. An "unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference", Brown v. Hughes, 894 F.2d 1533, 1538 (5th and 11th Cir., 1990) (limping prisoner complaining of pain / numbness in leg untreated for 12 hours states a claim).

111. Jones was deliberately indifferent because he saw me limping, supra pp. #30. I told him my foot was broken, supra pp. #31, he provided no treatment. He saw my foot was twice the normal size, he never sent me to x-ray, or did anything at all. Due to the obviousness of this serious injury, the subjective component of his knowledge of my need for treatment is established. The initial evaluation encounter Report of Date: 3/12/23m and he omitted certain injuries to cover up for the officers' assault. (See exhibit, clinical encounter report). His indifference along with that of other medical staff, see infra pp. 121 (claim 10), as well as that of the security staff, supra pp. 80-83 (claim 4) resulted in a two-day delay in treating my broken foot and getting needed x-rays, supra pp. #40-44. To the extent that R.N. Jones played as a "gatekeeper". He is also liable for not referring me to a doctor, and omitting facts / submitting a falsified report, on official government document, Boretti 930 F.2d at 1155; cited in Mata, 427 F.3d at 755.

CLAIM NINE: Failure to Refer Against the United Stated

112. The U.S. has a duty to contact a licensed medical professional, whether a nurse, physicians assistant, or doctor, who learning of my serious shoulder injury and untreated broken foot as alleged by myself and to inform him or her of my complaint and request for medical care. I incorporate the sections on duty, its determination scope, as well as the laws on negligence and special relationships here. See supra pp. 85-90.

113. As to the incorporated paragraph, #89 (citing policies and regulations that create and evidence the U.S. duty), only one section is relevant. See supra pp. #89 (c) (rule on immediately recording and treating injuries). Other scope defining policies are found in the following documents:

114. Duty Arises too, out of the common law analysis of the "Laman Factors", Laman, 744 P2d. at 46 (laying out factors on judicially found duty.

(a) The "risk involved" from defendant conduct: Here refusing to alert medical to exceptionally serious injuries, risk lifelong handicap, extreme agony, and emotional trauma, as well as further

16.

injury. Generally, conduct like this can lead to a prisoner's death, such as that of a prisoner having an asthma attack. A request for an inhaler never forwarded to medical, results in suffocation, a lethal untreated stroke, or a broken bone causing an internal infection killing the prisoner. See supra pp. #44-47.

(b) "Foreseeability and Likelihood of Injury": here, generally, it's common knowledge that to refuse to refer inmate health concerns to the prison infirmary can result in pain, injury, and death, all of which is foreseeable. Specifically, not being immediately referred for medical care by Ms. Hopper for my grievous handicaps, rendered my consequent pains, traumas, and sufferings 100% foreseeable and reasonably likely. This is common sense.

(c) The "Social Utility of the [Defendants'] Conduct" here; There is no utility in violating my Constitutional Rights, see infra pp. 121 (deliberate indifference based on same facts), nor in violating agency policies. See supra pp. 115 (for medical care)

(d) The Magnitude of the Burden" on Defendants: here, there is no burden because there are already policies and systems established to facilitate this duty's effectuation, supra. There are thusly, no costs to refer me to medical upon injury, and no parallel burden.

(e) The Consequences of Placing the Burden Upon" the Defendants: here, I incorporate my prior response, see supra pp. 90 part (e) (addressing same factor for claim five, failure to refer). I only substitute the word "guards", supra for "staff", as she is not a nurse or a "guard".

115. As a final note on duty, I incorporate my citation of the treatise and case law texts here. See supra pp. 99 (duty to take "reasonable" action when one has "reason to know the plaintiff is endangered, or is… injured.") The infirmary should've been notified by Ms. Hopper.

116. This breach resulted in injuries, that were proximately caused by the breach itself. Had I been referred to medical, I would have been diagnosed and treated, which would have prevented the 24 hours of pain and suffering, and exacerbation of those serious injuries, which resulted in great agonies, pure hell for more than 48 hours or more.

117. This discretionary function exception doesn't apply because the U.S. under the same facts, by Ms. Hopper and R.N. Jones, violated my rights to be free from deliberate indifference, infra pp. 121 (claim ten), and because of the violation of prison policy and regulations, supra pp. 115; I incorporate the case law on the "D.F.E.", cited priorly here. See supra pp. #95.

---

CLAIM TEN: Deliberate Indifference of Ms. Hopper and R.N. Jones

118. I incorporate the case law cited in the Deliberate Indifference claims against Jackson, supra pp. #80 (claim four), and Jones, supra pp. #111 (claim eight), to show that when Hopper was informed of my serious injuries (whereas R.N. Jones falsified and lied to cover up those serious injuries) supra #36, and Hopper refused to get me medical care as a "gatekeeper", supra pp. #37. She was deliberately indifferent to my health, welfare, and sufferings. Ill not cite the case law incorporated for "brevity", because the relevance of the incorporated laws are obvious.

I bring this before the Court in Good Faith and in Truth, in ask that all incidents, information, and facts are considered and weighed against the laws therein, and B.O.P. Policies and Guidelines used to preserve and secure the safety of all B.O.P. prisoners, as well as for all U.S. staff to adhere to. All statements of events listed are based of truth and evidence. All videos are within the care of the B.O.P., and can be subpoenaed and submitted as evidence for the claim .

1/6/2025

Robert L. Floyd

18.

# Exhibit
# ONE



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

---

*Office of the Regional Counsel*

*400 State Avenue*
*Tower II, Suite 800*
*Kansas City, KS  66101*

October 8, 2024

Robert Floyd, Reg. No. 04526-067
United States Penitentiary ADMAX Florence
P.O. BOX 8500
Florence, CO  81226

RE:    Tort Claim TRT-NCR-2024-04798
       Amount of Claim:  $1,000,000.00

       Certified Mail Receipt No:    9589 0710 5270 0370 0318 92

Dear Claimant:

Your above referenced tort claim has been considered for administrative review pursuant to 28 C.F.R. § 0.172, Authority: Federal Tort Claims and 28 C.F.R. Part 14, Administrative Claims under Federal Tort Claims Act.  Investigation of your claim did not reveal that you suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment.

As a result of this investigation, your claim is denied.  This memorandum serves as a notification of final denial under 28 C.F.R. § 14.9, Final Denial of Claim. If you are dissatisfied with our agency's action, you may file suit in an appropriate U.S. District Court no later than 6 months after the date of mailing of this notification.

Sincerely,

Mary A. Noland
Regional Counsel



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

---

*Office of the Regional Counsel*

*400 State Avenue*
*Tower II, Suite 800*
*Kansas City, KS 66101*

05-06-2024

ROBERT FLOYD, #04526-067
ADX FLORENCE
P.O. BOX 8500
FLORENCE, CO 81226

> Re: Administrative Claim for Damages
> Claim #: _____ TRT-NCR-2024-04798 _____ $ 1,000,000.00 _____

Dear Claimant:

    This is to notify you of our receipt of your administrative claim for damages under provisions of the <u>Federal Tort Claims Act, Title 28 USC §1346(b), 2671 et. seq.</u>, alleging liability of the United States Government.

    Your claim was received on 03-01-2024. The above referenced Act provides that the agency has 6 months to make an administrative determination on your claim from the date such claim was received by the appropriate agency. Accordingly, in the matter of the above referenced claim, the government's response is not due until 08-31-2024.

    Regulations that may be pertinent to your claim may be found at Title 28 C.F.R. Part 14 et.seq., and §543.30.

Sincerely,
Mary A. Noland
Regional Counsel

# Exhibit TWO

5/23/23, 1:20 PM                                                        StatRad Exam Requisition



## ADX Florence FLM

| | | | |
|---|---|---|---|
| Patient: | **FLOYD, ROBERT L. (Male)** | DOB: | 10/11/63 |
| Register#: | **04526-067** | Age: | 59 |
| Date: | 05/23/23 10:52 | Status: | OP |

Slicecount:      3
History:         F/U right foot 2nd and 3rd metatarsal fractures
Priors:          Right Foot 3/14/23
Exams:           XR RIGHT FOOT, 3+ views
Referring Phy:   D.Oba MD
Ordering Phy:
Ordering Phy #:  7197849464
Accession Numbers: 1.2.840.113619.2.242.4.2147483647.1684856286.977888

### Final Report

**ADDENDUM - Added by Farhad Khorashadi, MD on 5/23/2023 1:19 PM (-07:00)**
On second review of the images there is also noted a fracture of the proximal metaphysis of the fourth metatarsal which is also a subacute nondisplaced fracture showing some partial bony resorption healing changes. This is now more evident when compared to prior exam.

Exam: XR RIGHT FOOT

INDICATION: see above

TECHNIQUE: 3 views of the right foot are obtained.

COMPARISON: Right foot 3/14/23

FINDINGS:

Redemonstration of nondisplaced fractures of the proximal metaphysis of the second and third metatarsals without change in alignment. There is partial callus formation and near bridging healing changes with some bony resorption compatible with healing fractures. Portions of fracture line still visible.

No new fractures. No joint malalignment.

Joint spaces maintained.

No calcaneal spur.

No arthritic changes identified. Articular surfaces appear smooth.

Soft tissues are unremarkable by radiograph exam.

IMPRESSION:

Redemonstration of nondisplaced fractures proximal metaphysis of the second and third metatarsals without change in alignment with partial interval healing changes. Portions of fracture line still visible.

No new fractures. No joint malalignment.

4/4/23, 2:58 PM

StatRad Exam Requisition



# ADX Florence FLM

| | | | |
|---|---|---|---|
| Patient: | **FLOYD, ROBERT L. (Male)** | DOB: | 10/11/63 |
| Register#: | **04526-067** | Age: | 59 |
| Date: | 04/04/23 12:49 | Status: | OP |
| Slicecount: | 5 | | |

History: Looking for possible fractured ribs post altercation approx. 3 weeks ago, bilateral chest pain underarms mid axillary Rt > Lt

Priors:
Exams: FILM RIBS BILATERAL W/PA CHEST
Referring Phy: S.Maltezo FNP-BC
Ordering Phy:
Ordering Phy #: 7197849464
Accession Numbers: 1.2.840.113619.2.242.4.2147483647.1680628765.862297

## Final Report

**ADDENDUM - Added by Farhad Khorashadi, MD on 4/4/2023 2:53 PM (-07:00)**
**Addendum:**

On second review of the images there is a acute minimally displaced fracture of the right anterior lateral fifth rib. No other rib fracture seen.

Exam: FILM RIBS BILATERAL W/PA CHEST

Single frontal view chest along with 4 dedicated views of the ribs.

SCANNED

INDICATION: see above

COMPARISON: None

FINDINGS:

The cardiomediastinal silhouette is within normal limits.

Lungs are clear. No pleural effusions. No pneumothorax.

No acute osseous abnormality. Bony elements are within normal limits for age. No rib fractures.

IMPRESSION:

No acute cardiopulmonary disease.

Lungs are clear.

No acute osseous abnormality. No rib fractures.

Heart size within normal limits.

Radiologist:          Farhad Khorashadi, MD

Study ready at 12:50 and initial results transmitted at 14:26

3/14/23, 1:18 PM                                                    StatRad Exam Requisition



# ADX Florence FLM

| | | | |
|---|---|---|---|
| Patient: | **FLOYD, ROBERT L. (Male)** | DOB: | 10/11/63 |
| Register#: | **04526-067** | Age: | 59 |
| Date: | 03/14/23 09:48 | Status: | OP |
| Slicecount: | 6 | | |
| History: | Trauma x 3 days, right foot pain, R/O fracture | | |
| Priors: | | | |
| Exams: | FILM RIGHT FOOT | | |
| Referring Phy: | J.McGaugh DO | | |
| Ordering Phy: | | | |

Ordering Phy #: 7197849464
Accession Numbers: 1.2.840.113619.2.242.4.2147483647.1678805003.681643

---

### Final Report

**Exam: FILM RIGHT FOOT**

**INDICATION:** see above

**TECHNIQUE:** 6 views of the right foot are obtained.

**COMPARISON:** none

**FINDINGS:**

Acute transverse nondisplaced fracture proximal third metatarsal metadiaphysis.

Acute comminuted nondisplaced fracture proximal second metatarsal metadiaphysis.

No other fractures. No joint malalignment.

Mild to moderate soft tissue swelling at the mid foot.

Joint spaces maintained.

No calcaneal spur.

No arthritic changes identified. Articular surfaces appear smooth.

Remaining soft tissues are unremarkable by radiograph exam.

**IMPRESSION:**

Acute transverse nondisplaced fracture proximal third metatarsal metadiaphysis.

Acute comminuted nondisplaced fracture proximal second metatarsal metadiaphysis.

No other fractures. No joint malalignment.

Mild to moderate soft tissue swelling at the mid foot.

Radiologist:                     Farhad Khorashadi, MD

Study ready at 09:49 and initial results transmitted at 13:00



**Diversified Radiology**
1746 Cole Blvd, Suite 150
Lakewood, CO 80401

| | | | |
|---|---|---|---|
| **Patient:** | 76062540, DOC | **Date:** | May 7, 2023 14:15 |
| **DOB:** | October 11, 1963 | **ID No:** | 76062540FCC |
| | | **Acc No:** | 92882FCC |

*Floyd, Robert P*

*0 45×6 -067*

Glenohumeral joint and glenoid labrum:
The joint demonstrates normal alignment with a small to moderate joint effusion. There is diffuse chondral thinning and superficial fibrillation throughout the joint space. There is also moderate diffuse attenuation and degenerative fraying of the glenoid labrum. The inferior glenohumeral ligament appears scarred and irregular.

IMPRESSION:
1. There is a 14 mm AP high-grade full-thickness tear of the posterior supraspinatus insertion with retraction of the torn tendon fibers by 9 mm. There is no associated muscle atrophy.

2. There is a small to moderate poorly defined partial thickness tear of the cranial subscapularis insertion with underlying tendinosis. There is medialization of the adjacent long head biceps from the proximal bicipital groove with partial-thickness tendon tearing in the rotator interval. These findings suggest dysfunction of the biceps pulley mechanism.

3. Mild to moderate infraspinatus tendinosis without a tear.

Thank you for the referral of this patient. This examination has been interpreted by a board certified radiologist with Diversified Radiology who is fellowship trained in musculoskeletal imaging. If there are any questions, please feel free to reach us at 303-446-3223.

Electronically signed by: Vincent Herlihy, M.D.
5/23/2023 1:25 PM

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

C.C.     TO: MEDICAL RECORDS     10/8/23

ATTN: Y. Broullet / FR: Robert L. Floyd

#04526-067 / F-102

Ms. Broullet, After going over The medical Records You sent me.

For some Reason, The date of 3/12/2023 is missing. RespecTfully would you Please send me The medical Record of The day 3/12/23

Thank you.

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
State Highway 67 South
Florence, CO 81226

Y. Broullet
MRAS (ADX)
FCC Florence, CO

# Bureau of Prisons
# Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: FLOYD, ROBERT LEANDER | | | Reg #: 04526-067 |
| Date of Birth: 10/11/1963 | Sex: M Race: BLACK | | Facility: FLM |
| Encounter Date: 03/12/2023 12:20 | Provider: Jones, R. RN | | Unit: J01 |

Nursing - Evaluation encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT **1**    Provider: Jones, R. RN

Chief Complaint: Trauma/Injury

Subjective: I/M reports multiple injuries due to an altercation with another inmate. I/M reported that his Rt. foot was swollen form the cuffs put on his ankle area. Writer was able to put two fingers between the cuffs and his ankle area. I/M stated multiple injuries to Rt. side of tarsal and Rt. arm.

**Pain:** Yes

**Pain Assessment**

| | |
|---|---|
| Date: | 03/12/2023 19:27 |
| Location: | Multiple Locations |
| Quality of Pain: | Aching |
| Pain Scale: | 4 |
| Intervention: | Cleaned sites. |
| Trauma Date/Year: | |
| Injury: | |
| Mechanism: | |
| Onset: | <30 Minutes |
| Duration: | <30 Minutes |
| Exacerbating Factors: | none. |
| Relieving Factors: | none. |
| Reason Not Done: | |
| Comments: | |

COMPLAINT **2**    Provider: Jones, R. RN

Chief Complaint: Trauma/Injury

Subjective: I/M with multiple contusion site with no active bleeding noted. Sites approximately 1cm in diameter. 3 Lt shoulder. 12 upper Lt arm. 2 Lt lower arm. 5 Lt lateral back. Rt. forehead abrasion 1 cmx 3.5cm. above and lateral of Rt eye. I/M was able to ambulate from J unit to R&D and then to medical without difficulty or complications. I/M denies SOB or chest pain at this time. Full ROM to all extremities. All sites cleaned with not bleeding noted. I/M was able to speak in full sentences and verbalize his needs and concerns. I/m instructed to notify custody and medical if additional care is needed.

**Pain:** No

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 03/12/2023 | 12:20 FLX | 97.1 | 36.2 | Forehead | Jones, R. RN |

**Pulse:**

Inmate Name:    FLOYD, ROBERT LEANDER
Date of Birth:    10/11/1963
Encounter Date: 03/12/2023 12:20

Sex:    M    Race:  BLACK
Provider:  Jones, R. RN

Reg #:    04526-067
Facility:  FLM
Unit:    J01

### Mandible
Yes: Normal Range of Motion

### Lips
#### General
Yes: Abrasion, Swelling

### Mouth
#### General
Yes: Within Normal Limits

### Neck
#### General
Yes: Within Normal Limits

### Pulmonary
#### Observation/Inspection
Yes: Within Normal Limits

No: Coughing, severe w production green/brown mucus, Respiratory Distress

#### Auscultation
Yes: Clear to Auscultation, Vesicular Breath Sounds Bilaterally, Bronchial Breath Sounds

### Cardiovascular
#### Observation
Yes: Within Normal Limits

#### Auscultation
Yes: Regular Rate and Rhythm (RRR), Normal S1 and S2

### Peripheral Vascular
#### Arms
Yes: Radial Pulse Normal, Capillary Refill Normal

#### Legs
Yes: Popliteal Pulse Normal, Capillary Refill Normal

### Abdomen
#### Inspection
Yes: Within Normal Limits

## Comments
The allergies reviewed with patient for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food, and environmental factors.

## ASSESSMENT:

Wound Care

I/M with multiple contusion site with no active bleeding noted. Sites approximately 1cm in diameter. 3 Lt shoulder. 12 upper Lt arm. 2 Lt lower arm. 5 Lt lateral back. Rt. forehead abrasion 1 cmx 3.5cm. above and lateral of Rt eye.  Lower lip swollen.  I/M was able to ambulate from J unit to R&D and then to medical without difficulty or complications. I/M denies SOB or chest pain at this time. Full ROM to all extremities. All sites cleaned with not bleeding noted. I/M was able to speak in full sentences and verbalize his needs and concerns. I/m instructed to notify custody and medical if additional care is needed.

## PLAN:

## Disposition:

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | Reg #: | 04526-067 |
|---|---|---|---|---|---|---|
| Inmate Name: | FLOYD, ROBERT LEANDER | | | | Facility: | FLM |
| Date of Birth: | 10/11/1963 | Sex: | M | Race: BLACK | Unit: | C05 |
| Note Date: | 05/24/2023 15:35 | Provider: | Oba, D. MD | | | |

Cosign Note - Chart Review encounter performed at Health Services.

**Administrative Notes:**

ADMINISTRATIVE NOTE   1          Provider:  Oba, D. MD

MRI of the left shoulder 5/7/23 shows a complete tear of the left supraspinatus tendon and a high grade partial tear of the subscapularis tendon.  On site ortho consult for treatment options

**New Consultation Requests:**

| <u>Consultation/Procedure</u> | <u>Target Date</u> | <u>Scheduled Target Date</u> | <u>Priority</u> | <u>Translator</u> | <u>Language</u> |
|---|---|---|---|---|---|
| Orthopedic Surgery | 08/31/2023 | 08/31/2023 | Routine | No | |

Subtype:

Onsite Eval - Orthopedic Surgery

Reason for Request:

MRI of the left shoulder 5/7/23 shows a complete tear of the supraspinatus tendon and a high grade partial tear of the subscapularis tendon.  Requesting on site ortho examination.

Provisional Diagnosis:

left shoulder supraspinatus tendon tear, partial subscapularis tendon tear.

**Copay Required:** No          **Cosign Required:**  No

**Telephone/Verbal Order:**  No

Completed by Oba, D. MD on 05/24/2023 15:38

*My Doctor... for surgery on my left shoulder.*

## What's Next

**Follow up with STM Orthopedics**
Post op Appointment: ~2 weeks (To be scheduled)

1338 Phay Ave Bldg D Ortho
CANON CITY CO 81212-2326
719-285-2646

## Disclaimer

You may have been referred to a physician that is not in network for your health plan. We recommend that you check with your health plan before going to the appointment, and go either to our referral or another doctor of the same specialty that is in network for your plan. If you choose a non-network physician, you may incur charges that are your responsibility.

## Reason for Hospitalization

Your primary diagnosis was: Chronic Left Shoulder Pain

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

## 🏥 Care Providers

| Provider | Service | Role | Specialty |
|---|---|---|---|
| Mark Donald Porter, MD | Surgery | Attending | Orthopedic Surgery |

## Your Allergies

Date Reviewed: 10/13/2023

| Allergen | Reactions |
|---|---|
| Gemfibrozil | Not Noted |

## Your Latest Vitals

| | | | |
|---|---|---|---|
| Blood Pressure 112/64 | BMI 30.28 | Height 5' 10" | Temperature (Temporal) 98.1 °F |
| Pulse 73 | Respiration 23 | Oxygen Saturation 91% | BSA 2.14 m² |

04526-067

30-12.

Robert L. Floyd (MRN: CEUL1948675) (10/11/1963) • Printed by [22093026] at 10/13/2023 1:41 PM   Page 2 of 12   **Epic**



Diversified Radiology
1746 Cole Blvd, Suite 150
Lakewood, CO 80401

| Patient: | 76062540, DOC | Date: | May 7, 2023 14:15 |
|---|---|---|---|
| DOB: | October 11, 1963 | ID No: | 76062540FCC |
| | | Acc No: | 92882FCC |

*Floyd, Robert*

*64526-067*

**Examination:**   MR  MR LT SHOULDER WO

# Final Report

Referred By: Not available

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

EXAMINATION: MRI LEFT SHOULDER WITHOUT CONTRAST

COMPARISON: None available

CLINICAL SUMMARY: Progressive left shoulder pain for several months

TECHNIQUE: Multiplanar multisequence images were acquired through the shoulder including PD and PD/T2 with fat saturation series.

FINDINGS:
The examination is suboptimal secondary to excessive patient motion.

Osseous acromial outlet and acromioclavicular joint:
The joint demonstrates appropriate alignment with small marginal osteophytes. There is type II acromial morphology with mild subacromial spurring. There is moderate fluid in the subacromial subdeltoid bursal space.

Rotator cuff:
There is a 14 mm AP full-thickness tear of the posterior supraspinatus insertion with 9 mm retraction of the torn tendon fibers. There is underlying tendinosis and tear is best seen on coronal images 14 through 17.

There is a poorly defined mild to moderate partial-thickness tear of the cranial subscapularis tendon as seen on sagittal images 19 and 20 with mild to moderate underlying tendinosis.

There is mild to moderate infraspinatus tendinosis without a tear. The teres minor tendon is normal.

There is no rotator cuff muscle atrophy.

Long head biceps tendon and biceps pulley:
There is medialization of the long head biceps at the proximal bicipital groove with irregular attenuation and partial-thickness tearing of the intra-articular portion of the tendon.

# Exhibit
# THREE

C.C.    TO: MEDICAL RECORDS    10/8/23

ATTN: Y. BROUILLET / FR: Robert L. Floyd

#04526-067 / F.102

Ms. Brouillet, After going over The medical Records you sent me.

For some Reason, The date of 3/12/2023 is missing. Respectfully would you Please send me The Medical Record of The day 3/12/23

Thank you!

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
State Highway 67 South
Florence, CO 81226

Y. Brouillet
MRAS (ADX)
FCC Florence

C.C.

4/17/23

Sick Call / To: Primary P.A.

FROM: Robert L. Floyd
#04526-067
C-507

I Need some more pain killer
For my messed up shoulder,
And Broken Foot.
I have No Refills on That motrin
That you gave me.

I also still Request That
MDS For A pillow,
My neck has serious Pain
issues. And I Have made
Health Services well Aware
of my on-going pain problem.

Respectfully
RLF

C.C.

"cc"

11/21/23

"Sick Call" TO: HEALTH SERVICE
TO: Primary P.A / Dr. OBA
FROM: Robert L. Floyd #04526-067
C-507

I AM starting To have issues with my breathing. My exposer To That Teargas being ordered To stay on me for over an hour by A.W. JACKSON of date 3/12/2023. is causing Respatory Problems. I'm having continual shortness of breath.
This is AN underlying issue AT my Age... 60 This year. if I catch covid-19 Again. That could possibly be Life Threatening.

Also... I going To Need surgery for my Left shoulder, it's badly Tore up inside... its 10 Times worst if I write on A pain Level of 10... And swells even more, I Need stronger pain meds Than Motrin, And I Need To see a doctor, for my smashed foot broken Ribs, And severely Tore up Left shoulder,

Thank you    "cc"
Rob L Floyd J

"cc"

C.C.

## Sick Call / TO: Health Services

Robert L. Floyd #04526-067    Monday /3/20/23

C-507

Once Again, I need To go To The Hospital.
I am in severe pain! I have a broke foot, That
needs To be re set, and properly casted.
I have a Right Rib completely broke. That keeps
shifting and craking, and poking on The pluracavity
of The lung. I have one or possibly Two fractured Ribs
on The left side. (Ribs were never exrayed)
I have shattered bone and Tore ligaments and or Tendons
in my left shoulder, from being extremely Hyperextended
my pain level is To The point of passing out.
I can't shower, sneeze, cough, hardly get up To
walk, or even brush my Teeth.
I may have further internal injuries - but without
being completely medically abssesst. There's no way of
knowing. Im am also starting To have problems
with my vision. It has become blurry. And I have
Times of losing my balance.
I need To see a doctor, and go To The outside
hospital. I need a Toridol shot. I need an MRI
for my shoulder. I need more bone exrays.
I need To go To The outside Hospital!!

C.C.

C.C.

(MALTEZO)    (Sick Call)

Request To: Primary P.A. / AdX,

Fr: Robert L. Floyd #04526-067

C-Unit

Isolation Cell 507

Seriously, I need to go to the Hospital. This foot is not going to set right. Everytime I leave this boot on more than an hour. it swells up, and hurts worst, and turns purple - and not because its too tight. I didn't even recieve medical attention for several days. I need the bones set correctly - in a "set" cast.

How can the foot set right when I have to put weight on it everytime I have to get in - and out of the shower. And I only have one shoulder to even balance with - since my left shoulder is still swollen, and severely injured, after being hyperextended! You need to get me to a hospital, And let me see Dr. OBA. Because these motren you sent me are not gonna get it, I am in serious pain - cause you people didn't even bother to give me an exray for atleast 3 days. And I'm tucked away in this Plexiglass Isolation cell - so nobody can see how badly I was disfigured by the C.O.'s And A.W. Jackson.

C.C.

4/11/2023

C.C.

REQUEST TO STAFF MEMBER / HEALTH SERVICE
ATTN: MEDICAL REQUEST TO MEDICAL RECORDS
ATTN: Ms. BROUILLET
From: Robert L. Floyd #04526-067
                    C-507

RESPECTFULLY, I NEED COPIES OF ALL MY
MEDICAL RECORDS STARTING FROM MARCH 1ST
ALL THE WAY UNTIL APRIL 10TH (TO INCLUDE
THE FINDING RECORDS OF THE ARKANSAW
VALLEY SURGERY CENTER, IN REGARDS Regards
TO MY GI TRACT RESULTS) AND THE FINDING
RESULTS TO THE EXRAY dONE ON MY Ribs.

C.C.                                I would REALLY APPRECIATE iT.

                          RESPECTFULLY Robt. Floyd

4/26/23 - I just received the notes today.
See attached. The doctor and MLP hasn't
reviewed and signed off on them yet.

                    VB
Y. Brouillet
MRAS (ADX)
FCC Florence, CO

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

Sent 8/1/20

CC

"Request to Staff Member"
ATTN: A.W. Jackson
FR: Robert L. Floyd #04526-067
F-Unit
102 Cell

Mr. Jackson,
I Respectfully Request
That you house me back in
K-B Unit. I'll be 60 years old in
October. I've been here more than
2 decades.. I may walk with a limp
for the rest of my life. I have a
fully torn shoulder, Rotator cuff injury,
I get along well with the Ole Heads
over in K-B Unit, And I need access to
that big Track, To walk, To better mend
my foot up. Please allow me to step-
down to K-B Unit. On my word to you-
I promise to not be any problems
for anybody, I just want to heal
my body up. And Avoid anymore
Stress, And I can better program,
And function around like minded
old guys. That I Already Know.

Please seriously consider
This Request...

Respectfully
Robert L. Floyd

C.C

~ C.L.

TO: Medical Records Dept.
HEALTH SERVICES/ADX            Sent: 3/28/24
ATN: A. Rosales MRAS
From: Robert L. Floyd # 04526-067
                              C-202 cell

   Your department does have copies of those medical photo's - of my procedure (shoulder surgery) that were taken of that date, Oct, Fri 13TH 2023. During a post op visit to the orthopedic Dr. Poe Porter showed, and went over those photo's with me. And he also told me, that a copy of those photo's were indeed sent to the medical dept here. (Two officers, and a Lieutenant were witnessed to THAT FACT.)
   Any previously Medical Records Released to me, by design did not include those photo's, otherwise I would not be Requesting them. So kindly send me the copies of those photos, cause you know you have those photocopies as well as I do. Trying to Run me around in circles, is not going to deter my efforts in Pursuing this matter. (This is my Third Non Responsive Request to medical Rega Records)

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

C-

                    THANK You!

                    Rob L. Fl

C.C.

TO: SIS Dept.
ATTN: LT. QUINONES

3/20/2023

FROM: Robert L. Floyd #04526-067/C-507

RE: Notice of Discipline Hearing Before THe
(DHO) BP-A0294 Form

Be Advised! Counselor Weise is
Lying! I did Request A witness -
A.W. JACKSON

Weise wrote ~~said~~ I Refused To sigH.
That's Bull, ~~XXXX~~! He just slid
THe Forms under my door
And kept moving. (3/20/2023)
I Read iT - And Filled in THe
PART Requesting A witness

And will Promptly ReTurn To weise
Im sending This To SIS To make iT
A matter of Record!

I have A Broke Foot, Broken Ribs -
And A left sHoulder THAT Now Needs
surgery - All due To excessive force
used by ADX STAFF
WHAT ARE you gonna do About
THAT? You HAve THe on Nice Vision,

C.C.

# REQUEST TO STAFF MEMBER

"C.C"

12/5/2023 TO: Medical Records
Health Services.
ATTN: Ms. Brouillet
From: Robert L. Floyd #04526-067
                              F-Unit
                              Cell #102

Could you please send me a copy
of my complete Bloodwork Results
Taken around the date of Nov 24th, 2023
"Thank you". ~

Also --- please add a copy
of my Exray Results Taken a few
months back of my Chest, That was
done To check For Fractures, or
Broken Ribs... ✓

I appreciate it --- ✓

done y/B              " BY THE WAY - ~
Merry Christmas     Merry Christmas
and Happy New        And Happy New Year"
Year to you too.

                        Robert L. Floyd

Y. Brouillet
MRAS (ADX)
FCC Florence, CO

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

Name: Robert L. Floyd
Reg. No.: 04526-067
U.S. Penitentiary Max.
P.O. Box 8500
Florence, CO 81226-8500

Colorado Department of
Revenue
Denver Colorado
80261-0005

"Special Mail"

"Special Mail"

"LEGAL MAIL"

TO: CLERK OF THE COURT

ALFRED A. ARRAJ UNITED STATES,

COURT HOUSE;

901 19TH STREET, ROOM A.105

DENVER COLORADO, 80294-3589

Name: Robert L. Floss/
Reg No: 04526-061
U.S. Penitentiary MAX
P.O. Box 8500
Florence, CO. 81226-8500

"LEGAL MAIL"

MAILED OUT: JAN 6TH, 2025



9589 0710 5270 0835 5266 35

**CERTIFIED MAIL**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

FEDERAL PRISON CAMP
P.O. BOX ____
FLORENCE, COLORADO 8122_

DATE: _____

**SPECIAL / LEGAL MAIL**

The enclosed ____ was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosed to the above address.